**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **TERRY DIBBLE, # B81130,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18-cv-609-SMY** |
| | ) | |
| **DEANNA BROOKHART,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM AND ORDER**[1]

**YANDLE, District Judge:**

Following a jury trial in St. Clair County, Illinois, Petitioner Terry Dibble was convicted of the first-degree murder of Billy Barker and was sentenced to 45 years imprisonment. He is now in the custody of the Illinois Department of Corrections at Lawrence Correctional Center.

Dibble filed this action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He raises the following grounds in his Amended Petition (Doc. 14):

1. His conviction violates the Due Process clause of the 14th Amendment because the jury was instructed on a felony murder theory that was unsupported by the evidence and returned a general verdict that may have rested on that theory.

2. The prosecution's use of Christopher Mathis' prior consistent statements to rehabilitate his credibility violated due process, and the two attorneys who represented Dibble at trial were ineffective in failing to object.

3. The state's closing argument violated due process in that the prosecutor vouched for the credibility of witnesses Christopher Mathis and Preston Arnsperger and falsely implied that they had no motive to lie because they had already been convicted and sentenced, and trial counsel were ineffective in failing to object to these improper comments.

4. Trial counsel were ineffective in failing to:

---

[1]Citations in this Order are to the document and page numbers assigned by the Case Management/Electronic Case Filing ("CM/ECF") system.

(a) object to the felony murder charge;

(b) object to the felony murder jury instructions;

(c) argue that the evidence did not support an instruction on felony murder based on burglary;

(d) object to the prosecution's closing argument urging a finding of guilt based on the felony murder theory; and

(e) tender an instruction defining the term "building" as used in the burglary statute.

5. Trial counsel's opening statement constituted ineffective assistance in that it:

(a) contradicted Dibble's exculpatory statements;

(b) suggested that the evidence would show that Dibble drove Mathis and Arnsperger to Barker's house but waited in the car while they went in; and

(c) amounted to a concession that Dibble was guilty under accountability principles.

6. Trial counsel were ineffective in that they stipulated that Mathis and Arnsperger would not be impeached with the fact that their plea agreements included the state's promise not to charge them with the unrelated murder of Nelson Steinhauer.

7. Trial counsel were ineffective in that they failed to interview Mathis and Arnsperger before trial and instead apparently assumed that they would testify in accordance with the statements they had made to the police.

8. Trial counsel were ineffective in failing to properly impeach Arnsperger with his prior inconsistent statement claiming that he saw Dibble shoot Barker.

9. Trial counsel were ineffective in that they failed to tender jury instructions on:

(a) accomplice-witness testimony; and

(b) the substantive admissibility of certain prior inconsistent statements.

10. The state's notice of intent to instruct the jury on theories of first-degree murder that were not charged in the indictment violated due process.

11. The state violated due process by allowing Mathis and Arnsperger to testify to an incomplete version of their plea deals which omitted that, in return for their testimony against Dibble, the State would not charge them with the Steinhauer murder.

12. Appellate counsel was ineffective in failing to argue on direct appeal that the evidence was insufficient to support findings of guilt on the intentional, knowing, and strong probability theories of murder.

13. Appellate counsel was ineffective in failing to argue on direct appeal that the evidence was insufficient to find Dibble guilty under an accountability theory.

14. Appellate counsel was ineffective in failing to raise on direct appeal claims of due process and ineffective assistance of counsel as set forth in Grounds 4(c), 4(d), 4(e) and 10-13.

Respondent filed a Response (Doc. 16)[2] and Dibble filed a Reply (Doc. 28).  With leave of Court, Respondent filed a Sur-Reply (Doc. 32) to which Dibble responded (Doc. 35).  For the following reasons, Dibble's request for habeas relief is **DENIED**.

<h3 style="text-align:center">RELEVANT FACTS AND PROCEDURAL HISTORY</h3>

<h3 style="text-align:center">*State Trial Proceedings[3]*</h3>

Dibble was indicted in 1996 for the first-degree murder of Billy Barker.  According to the Indictment, "on or about the ninth day of November 1993, while committing the forcible felony of burglary, [Dibble], without lawful justification, shot Billy Barker in the head with a shotgun, causing the death of Billy Barker."  Before trial, the State filed a notice of intent to submit jury instructions on multiple alternative theories of first degree murder as set forth in the then-applicable version of 720 ILCS § 5/9-1(a)(1) through (a)(3) (intentional, knowing, and strong probability of death or great bodily harm, and felony murder).  (Doc. 17-1, pp.1, 3).

Dibble's conviction "rested primarily on the testimony of [Preston] Arnsperger and [Christopher] Mathis" who testified that Dibble drove them to Barker's home in Cahokia, Illinois,

---

[2] Relevant portions of the state court record are attached to Doc. 17.

[3] This summary of the facts is derived from the detailed description by the Illinois Appellate Court, Fifth District, in its Rule 23 Orders affirming Dibble's conviction on direct appeal and the dismissal of his postconviction petition. *People v. Dibble*, No. 5-99-0131 (November 7, 2000); *People v. Dibble*, No. 5-14-0228 (November 4, 2016); (Docs. 17-1 and 17-25).  The state court's factual findings are presumed to be correct unless rebutted by clear and convincing evidence, which Dibble has not done. 28 U.S.C. § 2254(e).

for the purpose of stealing drugs.  Arnsperger and Mathis did not know Barker, but Dibble knew him and knew that marijuana and cocaine would be in the house.  Dibble told Arnsperger and Mathis that Barker would not be home because he always spent his evenings in a tavern.  Dibble brought along a shotgun and the three entered the house through a window.  Arnsperger and Mathis went into a bedroom to look for drugs and Dibble went into a different part of the house. Arnsperger and Mathis heard a male voice that was not Dibble's say words to the effect of "Freeze, I've got a .45."  They then heard Dibble say "similar words" and heard an immediate shotgun blast. Arnsperger and Mathis left the house through the same window and Dibble came out of the house shortly thereafter.  Barker was found dead the next day, having been shot in the eye with a shotgun. Marijuana and money were found in plain view and nothing had apparently been taken from the house.  Dibble did not testify or present any evidence at trial.  (Doc. 17-1, p. 2-3).

Arnsperger and Mathis agreed to plead guilty to felony murder and to testify against Dibble in return for the State's agreement not to seek sentences in excess of 60 years against them.  The State also agreed not to charge them with respect to the disappearance and death of Nelson Steinhauer, which occurred on the same night as the Barker murder.  (Doc 17-25, p. 3).

The jury was instructed on intentional, knowing, strong probability, and felony murder. Regarding the felony murder theory, the jury was instructed that a person commits burglary when he enters a building without authority with the intent to commit a theft therein.  The jury was not instructed that "building" as defined by the burglary statute did not include a "dwelling place."[4] Dibble did not object to the instructions.  The jury returned a general verdict finding Dibble guilty of first-degree murder without specifying under which theory it convicted him.  (Doc. 17-1, pp. 3-

---

[4] The offense of residential burglary covers burglary of a "dwelling place," and simple burglary does not – the two offenses are mutually exclusive.  (Doc. 17-1, pp. 3-4).

4).[5]

### *Direct Appeal*

Dibble raised the following points on appeal that are relevant to the instant action:

1. He was denied a fair trial because the jury was instructed on felony murder based on burglary, but Barker's death took place in his home and residential burglary could not support a charge of felony murder.

2. He was denied a fair trial by the prosecution's use of Christopher Mathis' prior consistent statements to rehabilitate his credibility.

3. He was denied a fair trial by the state's closing argument regarding the credibility of witnesses Christopher Mathis and Preston Arnsperger.

4. Trial counsel were ineffective in thirteen respects, including failing to object to the felony murder charge and instructions, allegedly conceding petitioner's guilt under accountability principles in opening statement, failing to impeach Mathis and Arnsperger with the State's promise not to charge them in the Steinhauer case, failing to perfect impeachment of Arnsperger by proving up certain prior inconsistent statements, failing to object to the prosecution's allegedly improper closing argument comments, and failing to request a jury instruction on accomplice-witness testimony.

(Doc. 17-11). His conviction was affirmed and Dibble filed a Petition for Leave to Appeal (PLA) raising the first point and eight of the thirteen allegations of ineffective assistance. (Doc. 17-14). The Illinois Supreme Court denied the PLA in January 2001. (Doc. 17-15).

### *First Postconviction Petition*

Dibble's first postconviction petition was dismissed at the first stage, but the appellate court reversed the ruling. (Doc. 17-16). Counsel was then appointed for Dibble, who ultimately filed a Fourth Amended Petition which incorporated a *pro se* petition previously filed by Dibble. (Doc. 17-20). On appeal from the dismissal of that petition, through different counsel, Dibble raised the following points:

---

[5] Other facts will be discussed as necessary in the analysis below.

1. The postconviction petition court improperly weighed facts and disregarded well-pleaded facts regarding affidavits from two jail inmates which Dibble asserted established that Arnsperger and Mathis admitted setting Dibble up to take the blame for the Barker murder.

2. Postconviction counsel had been ineffective.

(Doc. 17-21).  The appellate court affirmed the dismissal in November 2016.  (Doc. 17-25).

Dibble's *pro se* PLA raised claims that had not been included in his counsel's appellate brief and the Illinois Supreme Court denied the PLA in March 2017. (Docs. 17-26 and 17-27).

### LAW APPLICABLE TO SECTION 2254 PETITION

This habeas petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, which "…modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).  Federal habeas review serves as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring)).  Habeas relief is restricted to cases where the state court determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A judgment is "contrary to" Supreme Court precedent if the state court "contradicts the governing law set forth in [Supreme Court] cases."  *Coleman v. Hardy*, 690 F.3d 811, 814 (7th Cir. 2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).  A state court decision is an "unreasonable application" of clearly established federal law if the state court "identifies the

correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Coleman*, 690 F.3d at 814 (quoting *Williams*, 529 U.S. at 407).

Even an incorrect or erroneous application of the federal precedent will not justify habeas relief; rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "A state court's decision is reasonable…so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.'" *McDaniel v. Polley*, 847 F.3d 887, 893 (7th Cir. 2017) (internal citations omitted). For habeas relief to be granted, the state court's application of federal precedent must have been "objectively unreasonable," meaning "something like lying well outside the boundaries of permissible differences of opinion." *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (internal citations omitted).

A habeas petitioner must clear two procedural hurdles before the Court may reach the merits of his habeas corpus petition: exhaustion of remedies and procedural default. *Bolton v. Akpore*, 730 F.3d 685, 694-696 (7th Cir. 2013). Before seeking habeas relief, a petitioner is required to bring his claim(s) through "one complete round of the State's established appellate review process" because "the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also* 28 U.S.C. § 2254(c). Under the Illinois two-tiered appeals process, habeas petitioners must fully present their claims not only to an intermediate appellate court, but also to the Illinois Supreme Court, which offers

discretionary review in cases such as this one.  *Id.*  Failure to do so results in procedural default.

ANALYSIS

*Claim 1 – Felony Murder and Burglary*

Dibble first claims that the State charged him with a crime that did not exist – felony murder based on simple burglary of a dwelling place.  That is not correct.  He was charged with first-degree murder.  Felony murder based on burglary was one of the theories of first-degree murder the State pursued, but neither the charging document nor the jury instructions mentioned a dwelling place.

Dibble also claims the State proceeded to trial *solely* on a theory of felony murder.  (Doc 14, p. 1; Doc. 28, p. 16).  That is also incorrect.  During her opening statement, the prosecutor did state that the evidence would show Dibble was guilty of felony murder based on burglary, but she also stated that the evidence would show that Dibble shot Barker.  (Doc. 17-2, p. 9).  The jury was instructed on alternative theories of first-degree murder (intentional, knowing, and strong probability of death or great bodily harm) in addition to felony murder.  (Doc. 17-1, pp.1, 3).  During closing argument, the prosecutor argued that the evidence established that Dibble was guilty under any of those theories because he was the one who had the gun and who shot Barker.  (Doc. 17- 10, pp. 10, 19).

The Illinois first degree murder statute, 720 ILCS § 5/9-1(a) defines "only a single offense of murder, which may be committed in a variety of ways" and the indictment need not specify the way in which the defendant is alleged to have committed the crime.  *People v. Maxwell*, 592 N.E.2d 960, 970 (Ill. 1992).  The jury may be instructed on a theory of the crime that was not alleged in the indictment as long as the defendant receives prior notice of the state's intention to do so and has an opportunity to defend against that theory.  *Maxwell*, 592 N.E.2d at 971.

8

Felony murder is one of the ways that first degree murder can be committed.  Under § 5/9-1(a)(3), felony murder includes causing a death while committing a "forcible felony."  At the time of Dibble's offense, the definition of forcible felony included burglary but not residential burglary.[6]  And, under the statutes then in effect, burglary and residential burglary were separate and mutually exclusive offenses.  *People v. Childress*, 633 N.E.2d 635, 647 (Ill. 1994).  Thus, a defendant could commit felony murder in the course of a burglary, but not residential burglary.  It is apparent from the trial transcript that no one involved in Dibble's trial – defense counsel, the prosecutors, or the trial judge – was aware of this.

Dibble's jury was instructed that it could find him guilty of first-degree murder on a theory of felony murder based on burglary.  But because the evidence also supported a finding that he committed residential burglary and not the separate crime of burglary, he argues that his due process rights were violated.  Respondent argues that the appellate court rejected the claim on the independent and adequate state ground of waiver, and that the court's alternative finding of no error was a reasonable application of clearly established Supreme Court precedent.

After analyzing Dibble's argument and concluding that no error had been committed, the appellate court observed that he had not objected to the jury instructions, argued that the felony murder instruction was not supported by the evidence, objected to the state's closing argument that he was guilty of felony murder based on burglary, or tendered an instruction defining "building" that would have excluded a residence.  Consequently, the court concluded that Dibble had waived the issue.  (Doc. 17-1, p. 7).  "When a state court resolves a federal claim by relying on a state law ground that is both independent of the federal question and adequate to support the judgment, federal habeas review of the claim is foreclosed."  *Richardson v. Lemke*, 745 F.3d 258, 268 (7th

---

[6] The definition of forcible felony, 720 ILCS § 5/2–8, was amended effective January 1, 1994 to include residential burglary.  1993 Ill. Legis. Serv. P.A. 88-277 (H.B. 1453) (West).

Cir. 2014) (quoting *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010)). The Illinois waiver rule relied upon by the appellate court is the type of state law ground that forecloses habeas review of a claim. *See Smith v. McKee*, 598 F.3d 374, 386 (7th Cir. 2010); *Richardson*, 745 F.3d at 271-72.

Dibble argues that consideration of his claim is not barred because the state court did not rely on the waiver rule but considered the merits of his federal constitutional claim. He cites *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), for the proposition that "[i]t is not enough for a state court to refer to a procedural bar as one of many reasons why the claim cannot prevail." (Doc. 28, p. 10). But that is an oversimplification of the ruling in that case. The Illinois Supreme Court also observed:

> After *Harris*, federal courts on habeas corpus review of state prisoner claims, like this Court on direct review of state court judgments, will presume that there is no independent and adequate state ground for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." [*Michigan v.*] *Long, supra*, 463 U.S. [1032], at 1040-1041, 103 S. Ct., at 3476-3477 [(1983)]. In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.

*Coleman*, 501 U.S. at 735.

In Dibble's case, the appellate court expressly relied on the waiver rule when it concluded, "[a]ccordingly, finding that no substantial rights of defendant were affected by the alleged error and that the evidence is not closely balanced, we find it to be waived." (Doc. 17-1, p. 7). It is not necessary for the court to have specifically stated that it relied *solely* on the state ground, and the Seventh Circuit has rejected the argument that "the presence of any discussion of the merits indicates that the state court did not base its ruling on independent state law grounds." *Smith v.*

10

*McKee*, 598 F.3d 374, 386 (7th Cir. 2010) (finding, "[o]nly when the state court's analysis of state law and federal law grounds are interwoven, to such an extent that we cannot clearly determine whether the state court opinion relies on state law grounds, do we set aside the state law grounds and address the issue.").

The appellate court's analysis of state and federal law grounds were not interwoven.  It is true that the court concluded that Dibble's substantial rights were not affected by the alleged error and that the evidence was not closely balanced, but that was in the context of its review for plain error.  *See People v. Thompson*, 939 N.E.2d 403, 413 (Ill. 2010).  Limited review by the state court for plain error is not a decision on the merits that allows a federal court to consider the claim on habeas review.  *Carter v. Douma*, 796 F.3d 726, 734 (7th Cir. 2015). The appellate court relied solely on the Illinois waiver rule in denying Dibble's direct appeal, and as a result, habeas review of the issue is precluded.

In any event, Dibble's claim would also fail on the merits because the appellate court's analysis as to whether there was error was correct under clearly established federal law at the time of its decision.  *See Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (internal quotation marks and citation omitted).  In 2000, when Dibble's direct appeal was decided, the Supreme Court's most recent relevant decision was *Griffin v. United States*, 502 U.S. 46 (1991), in which it reaffirmed that "a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds – even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action." *Griffin*, 502 U.S. at 49.  This is known as the "one good count rule."  The court noted that in *Stromberg v. California*, 283 U.S. 359 (1931), it had previously held that the one good count rule did not apply where one of the submitted grounds was unconstitutional.  *Griffin*, 502 U.S. at 53.  It also acknowledged that in *Yates v. United States*, 354

U.S. 298 (1957), it had found that the one good count rule did not apply where one of the submitted grounds was legally insufficient. *Griffin*, 502 U.S. at 51. The court, however, cast doubt on the idea that *Yates* was decided as a matter of constitutional law:

> *Yates*, however, was the first and only case of ours to apply *Stromberg* to a general verdict in which one of the possible bases of conviction did not violate any provision of the Constitution but was simply legally inadequate (because of a statutory time bar). As we have described, that was an unexplained extension, explicitly invoking neither the Due Process Clause (which is an unlikely basis) nor our supervisory powers over the procedures employed in a federal prosecution.

*Griffin*, 502 U.S. at 55-56.

Ultimately, the Supreme Court declined to expand *Stromberg* and *Yates* to a situation where one ground was not unconstitutional or legally insufficient, but merely unsupported by the evidence, noting that such an extension would be "unprecedented and extreme" and would conflict with *Turner v. United States*, 396 U.S. 398 (1970). *Griffin*, 502 U.S. at 56. As the appellate court correctly observed, the Supreme Court declined "to set aside a general verdict not because one of the possible bases of conviction was unconstitutional but because one of the possible bases of conviction was merely unsupported by sufficient evidence." (Doc. 17-1, p. 6).

While Dibble concedes that a felony murder conviction based upon burglary is not unconstitutional (Doc. 28, p. 11), relying on *Czech v. Melvin,* 904 F.3d 570 (7th Cir. 2018), he argues that later Supreme Court cases, *Hedgpeth v. Pulido*, 555 U.S. 57 (2008), and *Skilling v. United States*, 561 U.S. 358 (2010), "although decided after petitioner's appeal, may be relied upon to determine *Yates's* constitutional origins at the time of the state appellate court's decision." (Doc. 28, p.14). But those cases are not helpful to Dibble because they involve general verdicts where one of the theories of conviction was legally insufficient.[7] By contrast, the theory of felony

---

[7] In *Hedgpeth*, the jury was instructed on multiple theories of first degree murder, but the felony murder theory was legally invalid under state (California) law because it permitted the jury to find him guilty of felony murder if he formed the intent to aid and abet the underlying felony only after the murder. *Hedgpeth*,

murder based on burglary was not legally invalid in his case; it was simply unsupported by the evidence and the appellate court recognized this distinction.  (Doc. 17-1, p. 4).  Therefore, Dibble's first claim fails.

### *Claim 2 – The Prosecution's Use of Mathis' Prior Statements*

Dibble argues that the prosecution's use of Christopher Mathis' prior consistent statements to rehabilitate his credibility violated due process, and that the attorneys who represented him at trial were ineffective in failing to object.  He tacitly agrees that this claim is procedurally defaulted because neither aspect of the claim was raised in his PLA on direct appeal (Doc. 28, p. 15), but he argues that his procedural default should be excused because he is actually innocent of felony murder based on burglary.

A "credible showing of actual innocence" may serve to excuse procedural default and permit a federal habeas court to review a defaulted constitutional claim.  *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013).  Such a showing "requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  Habeas review of defaulted claims may occur only in the "extraordinary case" where the petitioner has demonstrated that "more likely than not, in light of the new evidence…any reasonable juror would have reasonable doubt."  *House v. Bell*, 547 U.S. 518, 538 (2006).

Dibble's contention that he is innocent of felony murder based on burglary, that the State

---

555 U.S. at 59.  Similarly, in *Czech*, the jury was instructed on four theories of first-degree murder.  One of those theories was felony murder based on the underling felony of aggravated discharge of a firearm. That theory was legally invalid under state (Illinois) law.  *Czech*, 904 F.3d at 572.  And in *Skilling*, the jury was instructed on three objects of the charged conspiracy, but one of them, honest services fraud, was legally invalid because it was not criminalized by the relevant federal statute.  *Skilling*, 561 U.S. at 409.

proceeded to trial only on the felony murder theory, and that it is therefore more likely than not that the jury convicted him on that theory is unsupportable on the record.  He was convicted of first-degree murder, not felony murder.  The jury was instructed on other theories of first-degree murder besides felony murder.  The State presented evidence that Dibble shot Barker and argued that he was guilty of first-degree murder under each of the theories.   Thus, Dibble has not shown that he is actually innocent of first-degree murder, and his procedurally defaulted claims cannot be considered.

### *Claim 3 – Vouching for the Witnesses' Credibility*

Dibble claims the State's closing argument violated due process because the prosecutor vouched for the credibility of Christopher Mathis and Preston Arnsperger and falsely implied that they had no motive to lie.  He also argues that his trial counsel were ineffective in failing to object.  Dibble concedes that his due process claim is procedurally defaulted. (Doc. 28, p. 17).[8]  Therefore, the Court will not address that aspect of his claim.

The appellate court considered Dibble's claims of ineffective assistance of trial counsel on direct appeal and noted that Counsel "did make mistakes" (but did not specifically identify what those mistakes were).  It found that "many of the claimed mistakes by Counsel were strategic decisions over which Counsel has ultimate authority" and concluded that all claims of ineffective assistance failed because Dibble did not demonstrate prejudice as required to satisfy the *Strickland* standard.  (Doc. 17-1, pp. 8-9).

On habeas review, a claim of ineffective assistance of counsel must be analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Harrington v. Richter*, 562 U.S. 86, 105

---

[8] For the reasons previously explained, Dibble's procedural default is not excused by a credible claim of actual innocence.  This is true for all instances of procedural default noted herein.

(2011).  To establish ineffective assistance of counsel, a petitioner must demonstrate (1) that counsel's performance "fell below an objective standard of reasonableness" ("the performance prong"), and (2) "that the deficient performance prejudiced the defense" ("the prejudice prong"). *Strickland*, 466 U.S. at 687-88.  With respect to the performance prong, "*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney.'" *Id.*  In order to avoid the temptation to second-guess counsel's assistance, there is a strong presumption of adequate assistance and the exercise of reasonable professional judgment. *Id.* at 107-08.  Thus, a petitioner's right to effective assistance of counsel is violated only when counsel's conduct, in light of all the circumstances, "[was] outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

To satisfy the second prong, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.  If the state court's reasons are not explained, a habeas petitioner must show "there was no reasonable basis for the state court to deny relief." *Id.* at 98. And, where the federal issue was presented to the state court, an unexplained decision denying relief is presumed to have been adjudicated on the merits in the absence of an indication to the contrary. *Id.* at 99.  Even if the state court addressed only one prong of the *Strickland* analysis, the federal habeas court may review the unaddressed prong de novo. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

Here, the question is not whether this Court believes that Dibble's trial attorneys were ineffective, but rather, whether the appellate court's application of the *Strickland* standard was

unreasonable. "The bar for establishing the unreasonableness of a state court's application of *Strickland* 'is a high one, and only a clear error in applying *Strickland* will support a writ of habeas corpus.'" *Jones v. Brown*, 756 F.3d 1000, 1007 (7th Cir. 2014) (citing *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009)).

While a prosecutor is allowed to comment on a witness's credibility based on the evidence and reasonable inferences rather than personal opinion, improper vouching occurs if she "express[es] her personal belief in the truthfulness of a witness" or "impl[ies] that facts not before the jury lend a witness credibility." *United States v. Klemis*, 859 F.3d 436, 443 (7th Cir. 2017) (internal quotation marks omitted). During her closing argument, the prosecutor made the statement, "These people are not liars" (Doc. 17-10, p. 19) but did not improperly vouch for Mathis' or Arnsperger's credibility. She was responding directly to defense counsel's argument that Arnsperger and Mathis lied to place the blame on Dibble, and her argument that they were not liars was based on the evidence and reasonable inferences, including the witnesses' lack of motivation to lie because they had already pled guilty and been sentenced.

Dibble claims the prosecutor's argument was also misleading because Mathis and Arnsperger's plea deals were "contingent on their testimony." (Doc. 28, p. 17). That is a mischaracterization. While their plea agreements required them to testify at Dibble's trial, nothing in the record suggests that the agreements motivated them to testify falsely. In fact, Arnsperger specifically testified that he had agreed "to cooperate with . . . law enforcement officials for interviews and testify for the State against Terry Dibble" and that no one had told him "to tell anything other than the truth" when testifying. (Doc. 17-6, pp. 3, 6).

Lastly, Dibble asserts without elaboration that the prosecutor's argument, that the witnesses were "not trying to keep away from responsibility" because they had pleaded guilty and

received long prison sentences, constituted both vouching and a misrepresentation of the plea agreements. (Doc. 28, p. 18). For the reasons explained above, it was neither.

In sum, the objection Dibble argues for would have been without merit, and Counsel were not ineffective for failing to make it. *See Washington v. Boughton*, 884 F.3d 692, 701 (7th Cir. 2018).

### Claim 4 – Ineffective Assistance - Felony Murder Charge

Dibble claims that trial counsel were ineffective in failing to: (a) object to the felony murder charge; (b) object to the felony murder jury instructions; (c) argue that the evidence did not support an instruction on felony murder based on burglary; (d) object to the prosecution's closing argument urging a finding of guilt based on the felony murder theory; and (e) tender an instruction defining the term "building" as used in the burglary statute. Again, the grounds advanced in subparts (c), (d), and (e) are procedurally defaulted. (Doc. 28, pp. 19-20).

As to subpart (a), it is unclear what Dibble means by "failing to object to the felony murder charge." Felony murder based on burglary was a valid theory under Illinois law. The fact that it was not supported by the evidence was not a basis for objection or a motion to dismiss. *People v. Soliday*, 729 N.E.2d 527, 529 (Ill. App. 2000) (Illinois law does not authorize dismissal of indictment on ground that evidence is insufficient to prove the offense charged). Nevertheless, Dibble asserts that "counsel could have easily alerted the trial court and the State through a motion that a felony murder charge could not be based on a residential burglary." (Doc. 28, p. 19). But that would not have prevented the state from proceeding on the other theories.

As to subpart (b), Dibble does not specify what objection counsel should have made. He does not contend that the instructions were an incorrect statement of law, and the instructions given did not tell the jury that residential burglary could support the felony murder theory; they referred

only to burglary.  (Doc. 17-10, pp. 20-21).  Because the instructions were not an incorrect statement of law, the appellate court could have reasonably concluded that counsel were not ineffective for failing to object.  Dibble's claim that counsel should have tendered an instruction defining the term "building" was procedurally defaulted.  Accordingly, the court's conclusion that Dibble did not meet the prejudice prong of the *Strickland* test was not unreasonable.

### Claim 5 – Ineffective Assistance in Opening Statement

Dibble argues that his counsel's opening statement constituted ineffective assistance in that it: (a) contradicted Dibble's exculpatory statements; (b) suggested that the evidence would show that Dibble drove Mathis and Arnsperger to Barker's house but waited in the car while they went in; and (c) amounted to a concession that Dibble was guilty under accountability principles. Subparts (a) and (b) are procedurally defaulted because they were not raised for one full round of state court review.  (Doc. 28, p. 20).[9]

The claim advanced in subpart (c) is simply incorrect.   "A person is legally accountable for the conduct of another when . . . either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense."   720 ILCS § 5/5-2(c). During his opening statement, Counsel stated that Dibble drove Arnsperger and Mathis to Barker's house to buy drugs or to find out from Barker where they could buy drugs.  He stated that Dibble knew that Mathis' shotgun was his "constant companion," but did not say that Dibble knew Mathis had the shotgun with him that night or knew that Mathis carried the shotgun up to Barker's house. He also stated that Dibble stayed in the car while the other two went into the house and had no

---

[9] Dibble refers to another claim of ineffective assistance, that is, that counsel promised evidence in the opening statement that he failed to present.  (Doc. 28, p. 21).  However, that claim was not included in the PLA on direct appeal and is also defaulted.  (See Doc. 17-14, pp. 14-15).

reason to believe that a crime was going to be committed.  (Doc. 17-2, p. 10).  This is not an admission of guilt under accountability principles.  The State did refer to accountability principles in closing argument but did not argue that defense counsel's opening statement admitted guilt under accountability principles.  (Doc. 17-10, p. 7).  Rather, the State's theory was that it was Dibble who planned to steal Barker's drugs and who shot him, not that Dibble was accountable for the actions of Arnsperger and Mathis.

Dibble also complains that Counsel's concession that he was present at Barker's house contradicted his statement to the police that he was with his sister that night.[10]  Tellingly, Dibble has never claimed that his attorneys were ineffective in failing to investigate an alibi defense, failing to present an alibi defense, or failing to call his sister or girlfriend to testify about his whereabouts that night.  Given the anticipated evidence from Mathis and Arnsperger, and the fact that Dibble was the only one of the three who knew Barker, the appellate court could reasonably have concluded that counsel made a permissible strategic decision to admit Dibble's presence rather than to pursue a weak alibi defense.  *See Frentz v. Brown*, 876 F.3d 285, 293 (7th Cir. 2017) (Counsel's decision not to present a defense that was unsupported by evidence "was within the wide spectrum of permissible strategic decision-making.").  In light of the apparent weakness of Dibble's alibi, the court reasonably concluded that he did not demonstrate prejudice.

### Claim 6 – Ineffective Assistance – Agreement Regarding the Steinhauer Case

Dibble argues that Counsel were ineffective in stipulating that they would not cross-examine Mathis and Arnsperger about the fact that, pursuant to their plea agreements, the State agreed not to charge them with the murder of Nelson Steinhauer.  Dibble assumes that Counsel

---

[10] This aspect of counsel's performance was not included in the PLA on direct appeal and is procedurally defaulted. (Doc. 17-14, p. 14).  However, because Respondent addressed the issue on the merits, the Court will do so as well.  (Doc. 16, p. 38).

entered into the stipulation in exchange for the State's agreement not to use the pending Steinhauer murder charge against him. Thus, he argues that Counsel gave up valuable cross-examination material in exchange for nothing because the State could not have used the pending charge or other bad acts evidence against him in any event.[11]

Dibble's assumption is belied by the record. The deaths of Nelson Steinhauer and Barker occurred about an hour apart and Dibble, Mathis, and Arnsperger were alleged to have been involved in both. (Doc. 17-2, p. 6). Charges were pending against Dibble in the death of Steinhauer at the time of trial. At the beginning of the trial, outside the presence of the jury, defense counsel informed the trial court about an agreement between the State and the defense regarding the Steinhauer case:

> Intertwined through it, all of the police reports throughout the entire investigation, throughout the statements of virtually every key witness, there is mention of both of those incidents because it is as a result of the investigation of Nelson Steinhauer that they kind of back into the allegations that are now before the Court on the death of Mr. Barker.
>
> So the statements of Preston Arnsperger, Christopher Mathis, Allen Arnsperger, Jennifer Younts, and virtually every one of the police officers, the potential for them to step into something is great and we have agreed. . . . that the witnesses who will be examined on direct examination will not be asked about that, and they will be instructed not to mention the death of Mr. Steinhauer. We obviously know that our cross examination is potentially fraught with danger, [and] we will steer as far clear of any mention of that so as not to open the door.

(Doc. 17-2, p. 5). Counsel then explained that the defense intended to cross-examine Mathis and Arnsperger on the terms of their plea agreements without referring to the Steinhauer case and that he did not want the witnesses to volunteer that they were "not going to be prosecuted for this other case." (Doc. 17-2, p. 5).

This Court must first examine "the objective reasonableness of counsel's performance."

---

[11] Dibble subsequently pled guilty to home invasion in the Steinhauer case and was sentenced to 40 years imprisonment, to be served consecutively to his sentence for the Barker murder. (See Doc. 14, p. 5, n.2).

*Harrington*, 562 U.S. at 110.  In that vein, it is clear that Counsel's objective in entering into the stipulation was to avoid any indirect or accidental reference to the Steinhauer case from any witness.  "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  And, "deciding what questions to ask a prosecution witness on cross-examination is a matter of strategy."  *See United States v. Jackson*, 546 F.3d 801, 814 (7th Cir. 2008).

The appellate court determined that "many of the claimed mistakes by counsel were strategic decisions over which counsel has ultimate authority."  (Doc. 17-1, p. 9).  Defense counsel were vigilant in guarding against any mention of another case from any witness, and the appellate court could reasonably have concluded that counsel made a strategic decision to forego questioning Mathis and Arnsperger about the state's agreement not to charge them in the Steinhauer murder as part of that overall effort.

The appellate court's conclusion that the failure to cross-examine Mathis and Arnsperger about the Steinhauer case did not meet the prejudice prong of the *Strickland* test was also reasonable given defense counsel's vigorous cross-examination regarding the other aspects of the witnesses' plea agreements.  (Doc. 17-1, p.2).  The jury was certainly made aware that Mathis and Arnsperger had received substantial benefit from their plea agreements, which was the point after all.

### Claim 7 – Ineffective Assistance – Failure to Interview Arnsperger and Mathis

Dibble argues that his lawyers were ineffective by failing to interview Mathis and Arnsperger before trial and merely assuming that they would testify in accordance with the statements they made to the police.  This claim is procedurally defaulted and will not be considered.  (Doc. 28, p. 22).

### *Claim 8 – Ineffective Assistance – Impeachment of Arnsperger*

Dibble faults defense counsel for the manner in which he cross-examined Arnsperger about

his prior inconsistent statements.   Arnsperger testified on direct examination that he was in

Barker's bedroom when he heard a shotgun blast in a different part of the house.   (Doc. 17-6, p.

5).   Counsel then conducted a lengthy cross-examination, questioning Arnsperger about several

alleged inconsistencies between his testimony and his prior statements to the police.   (Doc. 17-6,

pp. 6-16).   On re-cross, Counsel emphasized that before Arnsperger talked to the police, he had

plenty of time to get together with Mathis, whom he regarded as a "brother," and agree upon a

story blaming Dibble.   (Doc. 17-7, pp. 1-2).

Quoting from the trial transcript, Dibble focuses on one alleged inconsistency:

Q. [DEFENSE COUNSEL:] Do you remember telling the police that you actually
saw Terry Dibble shoot Billy Barker?
A. [ARNSPERGER:] I never even said that.
                                                * * *
Q. Preston stated that Dibble put the shotgun up to Barker . . . then shot Barker one
time and Barker fell to the floor. You never did state . . .[that]?
A. . . . I did not.
(Tr. 265-66)
                                                * * *
Q. You were, as I understand it now, in the quote, bedroom . . . [when the shot was
fired]; is that correct?
A. Yep.
Q. Then how do you suppose the police officers wrote down Preston stated that
once they were inside the house they were in a big room that appeared to be a living
room?
A. No.
Q. Because there was a big TV in the room.  Can't explain that one either, Can you?
A. No, I can't.
(Tr. 275).

(Doc. 14, pp. 37-38) (ellipses and brackets in Amended Petition).  Dibble asserts that this exchange

was ineffective assistance because:

Defense counsel failed to "direct[ ] the attention of the witness to the time, place,
to whom made, other circumstances of the inconsistent statement and the substance

22

of it and ask the witness if he said it." [citation omitted].  Instead, counsel engaged in an argumentative exchange with the witness.  Although trial counsel claimed to be reading from police reports, he never identified to whom the statements were being made.  Also, counsel never called any police officers to testify as to what Arnsperger said.

(Doc. 14, p. 38-39).

As an initial matter, Respondent argues that this point must be denied because nothing in the record before the appellate court established that Arnsperger actually made the statements that Counsel questioned him about.  Respondent points out that the trial transcript suggests that Arnsperger gave a videotaped statement to the police and that the police also prepared a written summary of his statement.  Dibble does not specify whether the statements in issue were contained in the videotaped statement, the summary, or both.  Respondent also notes that Arnsperger's statements and the police summary were not in the record on direct appeal and argues that, since the record before the court did not establish that defense counsel could have perfected his impeachment with the prior inconsistent statement, the court reasonably denied the point.  (Doc. 16, p.43).

Dibble requests a hearing under 28 U.S.C. § 2254(e)(2) because he was unable to develop this claim on direct appeal, "despite diligent effort."  (Doc. 28, p. 23).[12]  Respondent argues that federal habeas review under § 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Only after the habeas court determines that a petitioner has "overcome the limitation of § 2254(d)(1) on the record that was before th[e] state court" may the federal court consider whether an evidentiary hearing is warranted.  *Id.* at 185.  Respondent also argues that Dibble is not entitled to a hearing because he did not diligently attempt to develop a factual record in state court.  (Doc. 32).

---

[12] Because Dibble first raised his request for a hearing in his Reply, this Court granted Respondent leave to file a Sur-reply.

Dibble maintains that § 2254(d) does not apply at all to the performance prong of the *Strickland* test with respect to this claim because the state court did not decide that prong. He also argues that he diligently attempted to develop a factual record in state court. (Doc. 35). As this Court has already concluded, the *Harrington* presumption of adjudication on the merits applies to the performance prong of this claim and habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181. Section 2254(e)(2) permits a hearing where the federal habeas court finds that the state court's decision was based on an unreasonable determination of the facts under § 2254(d)(2). *Lee v. Kink*, 922 F.3d 772, 775 (7th Cir. 2019). That is not the case here.

Additionally, Dibble did not employ the procedures available in Illinois to expand the record on direct appeal for consideration of ineffective assistance claims. *See Crutchfield v. Dennison*, 910 F.3d 968, 977 (7th Cir. 2018) (describing those procedures). Although he reasserted his ineffective assistance claims in the postconviction review proceedings, he conceded that they were barred by *res judicata* at that stage. (Doc. 17-20, p. 9). Still, he could have developed the record by filing the report with his postconviction petition but did not. A petitioner is entitled to a hearing under § 2254(e) only where he has diligently attempted to develop a factual record in support of the claim in state court. *See Williams v. Taylor*, 529 U.S. 420, 429-30 (2000). Because Dibble did nothing to develop a factual record in state court, the Court declines his request for an evidentiary hearing.

Turning to the merits of the claim, again, where the federal issue was presented to the state court, an unexplained decision denying relief is presumed to have been adjudicated on the merits in the absence of an indication to the contrary. *Harrington*, 562 U.S. at 99. Because that presumption applies, this Court reviews this claim on both the performance and prejudice prongs

under § 2254(d).

Dibble contends that Counsel's cross-examination of Arnsperger fell below an objective standard of reasonableness because he did not follow the proper procedure of calling the circumstances of the inconsistent statement to the witness' attention and asking him if he made it. He cites *People v. Henry*, 265 N.E.2d 876 (Ill. 1970), for the proposition that the procedure he describes is required.  The Illinois Supreme Court's ultimate conclusion in that case undermines his argument, however.  Specifically, after noting the typical cross examination method Dibble references, the court held that the foundation for admission of a prior inconsistent statement is laid without following the formulaic script where the questions asked on cross-examination "substantially satisfy the reasons for the rule requiring a foundation" – "to protect the witness against unfair surprise and to permit his explanation of the prior statement."  *Id.*

The totality of the cross-examination versus the brief and edited passage cited by Dibble reveals that Counsel established that Arnsperger initially denied knowing anything about Barker's murder, but subsequently changed his story and gave a videotaped statement to police.  Arnsperger explained the allegedly inconsistent statements attributed to him in the report by saying that the police "must have made a mistake." (Doc. 17-6, p. 7).  Then, evidently reading from the report, Counsel asked, "Preston stated that Dibble put the shotgun up to Barker and told him you freeze mother fucker, get back, Preston stated that Dibble then shot Barker one time and Barker fell to the floor.  You never did state what I just read you stated, is that your testimony?"  When Arnsperger denied making the statement, Counsel asked him, in effect, why the police would have written that he did.  He replied, "Probably did a half ass job, to tell you the truth."  (Doc. 17-6, pp. 8-9).  The questioning regarding Arnsperger's alleged statement that he was in the living room instead of the bedroom was similar.  (Do. 17-6, p. 11).  Presented with this record, the appellate

court could reasonably have concluded that the cross examination as a whole was not deficient.

Dibble also complains that defense counsel failed to call a police officer to testify that Arnsperger said he was in the living room and saw Dibble shoot Barker.  But because he did not establish that an officer would have testified that Arnsperger made these statements, he has not shown that Counsel's performance was deficient.[13]

Dibble further argues he was prejudiced by counsel's cross-examination "because if the jury had heard evidence that Arnsperger was in the same room when Barker was shot, it would have concluded that the rest of Arnsperger's story was equally unreliable."  (Doc. 14, p. 39).  The jury *did* hear evidence that Arnsperger at one time told the police that he was in the living room and saw Dibble shoot Barker – Counsel read those statements from the police report.  And, Counsel argued forcefully in closing that the jury should not believe Arnsperger and Mathis because they changed their stories over and over.  (Doc. 17-10, pp. 11-15).  As such, Dibble's claim fails on both prongs of the *Strickland* standard.

### Claim 9 – Ineffective Assistance – Failure to Request Jury Instructions

Dibble argues that trial counsel failed to tender jury instructions on accomplice-witness testimony and the substantive admissibility of Mathis' prior inconsistent statement that it was he and not Dibble who broke the window at Barker's house, and were therefore ineffective.  He concedes that his claim regarding the admissibility of Mathis' prior inconsistent statement is procedurally defaulted.  With respect to the jury instructions, Dibble contends that Counsel should have tendered I.P.I. Crim. 3d No. 3.17, which would have informed the jury that "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness

---

[13] Because the appellate court could have reasonably concluded that counsel's performance was not deficient, this Court need not address the *Strickland* prejudice prong, but will do so for the sake of completeness.

is subject to suspicion and should be considered by you with caution.  It should be carefully examined in light of the other evidence in the case."

Dibble would likely have been entitled to have the instruction given had it been tendered. *See* Committee Note, Ill. Pattern Jury Instr.-Criminal 3.17.  However, the appellate court's conclusion that the outcome was not likely to have been different had the instruction been given was a reasonable application of *Strickland*.  The purpose of the accomplice witness instruction "is to warn the jury that the witness might have a strong motivation to provide false testimony for the State in exchange for immunity or some other lenient treatment."  *People v. Hunt*, 67 N.E.3d 542, 552 (Ill. App. 2016).  Dibble's jury was well aware that Mathis and Arnsperger were testifying pursuant to favorable plea deals and that they had both made prior inconsistent statements regarding Barker's murder.  Considering the evidence and the collective instructions, there is very little chance that the giving of the accomplice witness instruction would have changed the outcome of the trial, and the appellate court's conclusion was not unreasonable.

### Claims 10 through 14 – Procedural Default

Respondent argues that the remaining claims, 10 through 14, are procedurally defaulted. Dibble maintains that claims 10 and 11 were fairly presented to the state court because he tried to raise them in a *pro se* supplemental brief on appeal of the denial of his postconviction petition. (Doc. 28, p. 24).  However, invoking its rule against hybrid representation, the appellate court ordered the *pro se* supplemental brief stricken.  (Doc. 17-25, pp. 1-2).  The Illinois rule against hybrid representation is an independent and adequate state ground, and as such, claims 10 and 11 cannot be considered on habeas review.  *Clemons v. Pfister*, 845 F.3d 816, 820 (7th Cir. 2017). Similarly, because Dibble tacitly concedes that claims 12 and 13 are procedurally defaulted, again, those claims are not subject to this Court's review.  (Doc. 28, p. 24).

Finally, as to Claim 14 – that appellate counsel was ineffective for failing to raise claims of due process and ineffective assistance of trial counsel on direct appeal – Dibble again concedes the default but argues that "he has overcome the default through manifest injustice." (Doc. 28, p. 24). This is presumably a reference to the fundamental miscarriage of justice standard which "… applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013). Dibble has not done so and this claim is likewise defaulted.

### CONCLUSION

For the foregoing reasons, Petitioner Terry Dibble's Amended Petition for Habeas Relief Pursuant to 28 U.S.C. § 2254 (Doc. 14) is **DENIED** in its entirety. This action is **DISMISSED with prejudice** and the Clerk of Court is **DIRECTED** to enter judgment accordingly and to close the case.

### CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, this Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate should be issued only where the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner must show that "reasonable jurists" would find this Court's "assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Where a petition is dismissed on procedural grounds without reaching the underlying constitutional issue, the petitioner must show both that reasonable jurists would "find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

No reasonable jurist would find it debatable whether this Court's rulings on procedural default or on the substantive issues were correct. Accordingly, the Court **DENIES** a certificate of appealability. Petitioner may reapply to the United States Court of Appeals, Seventh Circuit for said certificate. *See* FED. R. APP. P. 22(b); 28 U.S.C. § 2253(c)(1).

**IT IS SO ORDERED.**

**DATED:  July 6, 2020**

*s/ Staci M. Yandle*
**STACI M. YANDLE**
**United States District Judge**